## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| SALLY NESS,<br><br>        Plaintiff,<br><br>        v.<br><br>CITY OF BLOOMINGTON; MICHAEL O. FREEMAN, in his official capacity as Hennepin County Attorney; TROY MEYER, individually and in his official capacity as a police officer, City of Bloomington; MIKE ROEPKE, individually and in his official capacity as a police officer, City of Bloomington,<br><br>        Defendants. | Case No. 19-cv-2882 (ADM/DTS)<br><br>Hon. Ann D. Montgomery<br><br><br>**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS CITY OF BLOOMINGTON, TROY MEYER, AND MIKE ROEPKE MOTION TO DISMISS** |

## INTRODUCTION

This case challenges Defendants' restrictions on Plaintiff Sally Ness's fundamental, First Amendment right to film *in a public forum* information regarding *a public controversy* for the purpose of *public dissemination*.  It is a constitutional challenge to the City of Bloomington ("City") and County of Hennepin ("County") Defendants' enforcement of Minnesota Statute § 609.749 ("Harassment Statute") and the City Defendants' enforcement of § 5.21 of the City of Bloomington Code ("City Code") to restrict Plaintiff's First Amendment activity.  (Compl. [Doc. No. 1]).

In their motion, Defendants City, Meyer, and Roepke ("City Defendants") ask the Court to dismiss the lawsuit against them, arguing that the individual officers are entitled

to qualified immunity, that Plaintiff lacks standing to sue, and that Plaintiff has failed to state claims that are plausible on their face.  (City Mem. [Doc. No. 68]).  The City Defendants are mistaken.  The Court should deny their motion.

### STATEMENT OF FACTS

Plaintiff Ness resides in the City, which is located in the County.  Her home is in the Smith Park neighborhood.  For several years, Plaintiff has been documenting through videotaping and photographing the public controversy surrounding the Dar al-Farooq mosque and Success Academy school, which are located in her neighborhood.[1]  (Compl. ¶¶ 7, 34, 36, 42-44, 46, 55, 70-71).

This public controversy began in 2011 when Al Farooq Youth and Family Center (later called Dar al-Farooq or "DAF") applied for a land use permit to renew the existing conditional use on a "quasi-public" site in a residential zone (R-1) located in the Smith Park neighborhood.  (Compl. ¶ 20).

During the first five years (2011 to 2016), Plaintiff Ness and her neighbors were so concerned about the disruption to the neighborhood caused by DAF that they presented a petition to the City in 2016 demanding answers to their concerns.  The City dismissed the petition on procedural grounds, claiming that it failed to meet a codified definition of a "petition" and had no signatures.  (Compl. ¶¶ 34, 35).

The abuses permitted by the City were many, including, *inter alia*, excusing a host of unapproved DAF activities, such as operating a university and a restaurant, hosting

---

[1] The Dar al-Farooq/Success Academy controversy is described in greater detail in the Complaint.  (Compl. ¶¶ 20-46).

unpermitted regional events, and operating weekend schools over the permitted amount. The City also failed to enforce the Conditional Use Permit ("CUP") it issued to DAF and the Joint Use Agreement ("JUA") it entered into with DAF with regard to the property by ignoring, *inter alia*, parking and traffic violations and the excessive use of DAF's facilities and public facilities, including the neighborhood park.  (Compl. ¶ 36).

Additionally, DAF did not formally act to open the private school described in the CUP.  Instead, DAF began the process of opening a charter school (Success Academy) in 2017, without seeking an amendment to the CUP or even officially informing the City. When the City learned of the student activity, it initially warned DAF that student count must be no more than 60 per the CUP limits—that Fall DAF had over 80 students.  The City ultimately approved a new CUP for DAF in August 2018 for 130 students.[2]  (Compl. ¶ 37).

A City park playground (Smith Park) was offered to DAF by vote of the City Council for use of its lessee, Success Academy, despite a staff report conclusion that DAF should provide its own playground equipment.   The City has refused to address neighborhood concerns regarding the number of times per day or students per session that Success Academy may appropriate this City park for its recesses, rendering the park essentially unavailable to the general public, including Plaintiff Ness and her grandchildren.  (Compl. ¶¶ 38-40).

---

[2] As a recognized charter school, Success Academy is considered a public school.  *See* Minn. Stat. § 124E.03, subd. 1.

Plaintiff Ness has been the point person for delivering neighborhood concerns to the City.  She also maintains a public blog (https://5yearsofcollectingdata.weebly.com/) and Facebook page (https://www.facebook.com/groups/589133684592349/) that document many developments, observations, and concerns related to the DAF/Success Academy controversy in order to inform the public.  Plaintiff Ness uses photographs and videos, often posted for public view on YouTube, as part of her efforts to disseminate this information to the public.  (Compl. ¶ 42).

Because of her efforts to document and report the neighborhood concerns regarding DAF and Success Academy and the City's malfeasance related to these concerns, the City has been hostile toward Plaintiff Ness.  (Compl. ¶¶ 43-45).  As a consequence, she no longer speaks at City Council meetings.  Rather, she collects information regarding the DAF/Success Academy controversy and posts it on her blog/Facebook page for public dissemination.  (Compl. ¶ 46).  More specifically, Plaintiff Ness collects information for public dissemination of possible CUP and JUA violations by DAF and Success Academy by videotaping and photographing from public sidewalks, the public park, and while in her vehicle on a public street.  On occasion, she would conduct her filming activity, with permission, from her neighbors' driveways and from inside their homes.  All of the activity Plaintiff Ness films is in public view.  (Compl. ¶ 47).

In August 2018, a formal complaint was made against Plaintiff Ness for possible violations of the Harassment Statute because of her videotaping and photographing.  As usual, she was collecting information for public dissemination of possible CUP and JUA

violations by DAF and Success Academy.  In fact, she was filming traffic.  (Compl. ¶ 48; *see also* Boomer Decl. ¶¶ 3-6 [Doc. No. 27] [confirming 2018 investigation]).

On August 27, 2019, Plaintiff Ness was again collecting information regarding possible CUP and JUA violations by DAF and Success Academy when  she was approached by City police officers, including Defendants Troy Meyer and Mike Roepke. Plaintiff Ness was in her neighbor's driveway when the officers approached.  Her neighbor gave her permission to be there.  The officers told Plaintiff Ness that they were responding to a harassment complaint against her based on her videotaping.  (Compl. ¶¶ 50, 51).

During this conversation, the City police officers warned Plaintiff Ness that if she continued with her videotaping and the complainants felt harassed or threatened by it, then she would be subject to arrest under the Harassment Statute regardless of her intentions. (Compl. ¶ 52).

Plaintiff Ness obtained a copy of the official Bloomington Police Department report regarding this incident.  Pursuant to the report, Defendant Meyer "spoke with the (sic) Principal Rabeaa and parent Farrah and they stated the following: They both felt intimidated and scared that Ness was filming them and are worried that she may become violent towards them or their school.  I spoke with Ness and advised how the Principal and parent felt and *asked her to stop filming*."  (Compl. ¶ 53 [emphasis added]).  The police report concludes, "*Ness was advised that she could be charged with harassment if the parents and principal felt intimidated by her actions*."[3]  (Compl. ¶ 54 [emphasis added]).

---

[3] Accordingly, the City Defendants' assertion that "[n]othing the officers did or said indicated that Ness was forbidden to film or photograph what she wanted to record" (City

Plaintiff Ness has never engaged in, nor threatened to engage in, any violent activity. She is a peaceful person, and the DAF and Success Academy complainants and the City police officers know that she has always acted peacefully. Moreover, the only acts that the complainants and the police officers object to are her photographing and videotaping of public information related to the DAF/Success Academy controversy. (Compl. ¶ 55).

Because of this latest, credible threat by the City, through its police officers (Defendants Meyer and Roepke), to enforce the Harassment Statute against Plaintiff Ness because of her filming activity, she has ceased this activity.[4] Plaintiff Ness fears that she will be arrested and/or charged with violating the Harassment Statute if she continues filming DAF and Success Academy. (Compl. ¶¶ 57-59).

On October 28, 2019, the City, through the City Council, approved revisions to the City Code to include regulations that would restrict Plaintiff Ness's filming activity in public parks.[5] More specifically, the City approved and adopted the City Code, which includes the following restriction *in City parks*: "(24) No person shall intentionally take a

---

Mem. at 7 [Doc. No. 68]) is demonstrably *false*.

[4] Consequently, Plaintiff has already suffered a constitutional harm, which would entitle her to nominal damages as a matter of law. *See Carey v. Piphus*, 435 U.S. 247, 266-67 (1978); *Smith v. Coughlin*, 748 F.2d 783, 789 (2d Cir. 1984) (holding that a civil rights plaintiff "is entitled to an award of nominal damages upon proof of violation of a substantive constitutional right," citing *Carey*). This further supports the fact that she has standing to maintain this action. *See infra*.

[5] Plaintiff raises the fact that the City passed the challenged ordinance to prevent her filming activity (Compl. ¶¶ 68, 69) not as an argument to demonstrate the unlawfulness of the ordinance based on an illicit legislative intent, as the City argues. (City Mem. at 26 [Doc. No. 68]). Rather, the timing and context of the passage of the City Code supports Plaintiff's standing to challenge the ordinance since it targets her conduct.

photograph or otherwise record a child without the consent of the child's parent or guardian." (Compl. ¶¶ 19, 67).

Because Plaintiff Ness seeks to expose, *inter alia*, DAF's and Success Academy's noncompliant use and overuse of Smith Park, her information gathering efforts will include, quite necessarily, photographing and videotaping the use of Smith Park by children associated with DAF and Success Academy.  Additionally, Plaintiff Ness has taken pictures of students being dropped off to Success Academy and weekend school to document the noncompliant number of students attending the schools, the unsafe and noncompliant drop off conditions, and the number of students who are tardy.  (Compl. ¶¶ 70, 71).

The enactment of the City Code prevents Plaintiff Ness from videotaping or photographing information regarding DAF's and Success Academy's noncompliant use and overuse of the public park, as well as other noncompliance issues.  (*See* Compl. ¶ 72).

Because of the City Code, Plaintiff Ness has ceased her filming activity because she does not want to be penalized under the new City regulations.  (Compl. ¶ 73).

On October 30, 2019, at the request of Detective Kristin Boomer from the City Police Department, Plaintiff Ness met with Detective Boomer, Detective Tracy Martin, and Community Liaison Officer Caitlin Gokey at Plaintiff Ness's home.  (Compl. ¶ 60).

According to Detective Boomer, she requested the meeting because Plaintiff Ness was a suspect in a harassment case as a result of her filming activity related to DAF's and Success Academy's use of Smith Park.  (Compl. ¶ 61).

According to Detective Boomer, she was investigating the matter on behalf of the County and for the "victims," which she described as the "community center/mosque and school," or words to that effect, referring to DAF and Success Academy.  (Compl. ¶ 62).

During this meeting, Detective Boomer confirmed that Plaintiff Ness was under investigation by the County for alleged violations of the Harassment Statute due to her filming of DAF and Success Academy.  Detective Boomer also confirmed that one of the concerns of the investigation was Plaintiff Ness's photographing and/or videotaping of children associated with DAF and Success Academy.  This was one of the complaints from the "victims" of the alleged harassment.  (Compl. ¶¶ 63, 64).

During this meeting, Detective Boomer and Detective Martin suggested that Plaintiff Ness stop using Smith Park and that she should consider taking her grandchildren to another park.  (Compl. ¶ 65).

The October 30th meeting with Detective Boomer confirmed Plaintiff Ness's concerns and fears that she will be prosecuted under the Harassment Statute and penalized under the new City Code because she videotapes or photographs information regarding the DAF/Success Academy controversy.  Consequently, Plaintiff Ness has ceased all of her filming activity.  (Compl. ¶ 66).

Plaintiff Ness confirmed during the proceedings associated with her request for a preliminary injunction that Detective Boomer forwarded the investigation to the County Prosecutor for felony prosecution because Plaintiff's filming activity involved minors and the City can only prosecute misdemeanors.  (Boomer Decl. ¶ 14 [Doc. No. 27]).

When the County filed its opposition papers on December 18, 2019, Plaintiff Ness learned for the first time that the County declined to prosecute her. (Cnty. Opp'n at 8 [Doc. No. 43]; Harris Decl. ¶ 4 [Doc. No. 44]). The City had submitted the request for prosecution to the County on or about November 7, 2019. (Harris Decl. ¶ 3 [Doc. No. 44]). The County never disclosed *when* the decision was made not to prosecute Plaintiff. However, the Complaint was filed on November 12, 2019, and it, along with the original TRO motion, memorandum of law, and Plaintiff's declaration, were promptly served on November 15, 2019. (Aff. of Serv. [Doc. No. 13]). As of December 16, 2019, the City was unaware of the County's decision not to pursue the prosecution. (*See* Boomer Decl. ¶ 15 [Doc. No. 27]). And in its filings in opposition to Plaintiff's request for a preliminary injunction, the City stated that "[e]ven if Hennepin County declines to charge, . . . the Bloomington City Attorney's office will have the opportunity to review the information obtained through the Bloomington Police Department's investigation for possible non-felony charges." (City Opp'n at 12 [Doc. No. 24]; Boomer Decl. ¶ 16 [Doc. No. 27]). In their motion to dismiss, the City Defendants submitted a declaration now stating that they will not pursue prosecution of Plaintiff Ness for her "past conduct." (Glassberg Decl. ¶ 3 [Doc. No. 69]). In their respective motions to dismiss, both the City Defendants and the County assert that Plaintiff's filming activity is not shielded from prosecution by the First Amendment (City Mem. at 10-14 [Doc. No. 68]; Cnty. Mem. at 12-13 [Doc. No. 63]), thus leaving Plaintiff exposed to criminal prosecution for her activity.

## CITY CODE

The challenged City Code, which was adopted by the City on October 28, 2019, states, in relevant part, as follows:

### § 5.21 REGULATIONS.

The rules and permits in this section are required to ensure the safety and general welfare of the public and the quiet and orderly use and enjoyment of the city's parks.  The City Council may adopt fees and policies pursuant to this section in furtherance of these objectives.  The following regulations shall apply to all city parks.

* * *

(24) No person shall intentionally take a photograph or otherwise record a child without the consent of the child's parent or guardian.

* * *

### § 5.22 PENALTY.

Any person violating § 5.21 (9) or (13) shall be guilty of a misdemeanor, all other violations of this Article III shall be punishable as a petty misdemeanor.

(Compl. ¶ 19).

## HARASSMENT STATUTE

The challenged Harassment Statute states, in relevant part, as follows:

### 609.749 STALKING; PENALTIES.

**Subdivision 1.  *Definition.* —** As used in this section, "harass" means to engage in conduct which the actor *knows or has reason to know* would cause the victim under the circumstances to feel frightened, threatened, oppressed, persecuted, or intimidated, and causes this reaction on the part of the victim regardless of the relationship between the actor and victim.

**Subd. 1a.  *No proof of specific intent required.* —** In a prosecution under this section, *the state is not required to prove that the actor intended to cause the victim to feel frightened, threatened, oppressed, persecuted, or intimidated*, or except as otherwise provided in subdivision 3, paragraph (a), clause (4), or paragraph (b), that the actor intended to cause any other result.

* * *

- 10 -

**Subd. 1c.  *Arrest.* — *For all violations under this section***, except a violation of subdivision 2, clause (7), *a peace officer may make an arrest* under the provisions of section 629.34.  A peace officer may not make a warrantless, custodial arrest of any person for a violation of subdivision 2, clause (7).

**Subd. 2.  *Harassment crimes.* —** A person who harasses another by committing any of the following acts is guilty of a gross misdemeanor:

* * *

(**2**) follows, *monitors*, or pursues another, whether in person or *through any available technological or other means*;

* * *

**Subd. 3.  *Aggravated violations.***

(**a**) A person who commits any of the following acts is guilty of a felony and may be sentenced to imprisonment for not more than five years or to payment of a fine of not more than $ 10,000, or both:

* * *

(**5**) commits any offense described in subdivision 2 against a victim under the age of 18, if the actor is more than 36 months older than the victim.

* * *

**Subd. 5.  *Stalking.***

(**a**) A person who engages in stalking with respect to a single victim or one or more members of a single household which the actor knows or has reason to know would cause the victim under the circumstances to feel terrorized or to fear bodily harm and which does cause this reaction on the part of the victim, is guilty of a felony and may be sentenced to imprisonment for not more than ten years or to payment of a fine of not more than $20,000, or both.

(**b**) For purposes of this subdivision, "stalking" means *two or more acts within a five-year period that violate or attempt to violate the provisions of any of the following* or a similar law of another state, the United States, the District of Columbia, tribe, or United States territories:

(**1**) this section; . . .

Minn. Stat. § 609.749 (emphasis added).

## ARGUMENT

## I.  PLAINTIFF HAS STANDING TO ADVANCE HER CONSTITUTIONAL CLAIMS.

In an effort to give meaning to Article III's "case" or "controversy" requirement, the courts have developed several justiciability doctrines, including standing.  *See Susan B. Anthony List v. Driehaus,* 134 S. Ct. 2334, 2341 (2014).  "The doctrine of standing gives

- 11 -

meaning to these constitutional limits by identifying those disputes which are appropriately resolved through the judicial process." *Id.* (internal quotations and citation omitted).

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Consequently, to invoke the jurisdiction of a federal court, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984).

Plaintiff satisfies the standing requirement. As stated by the Supreme Court, "[I]t is not necessary that [Plaintiff] first expose [herself] to actual arrest or prosecution to be entitled to challenge a statute that [she] claims deters the exercise of [her] constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). This is precisely the situation presented here. *Steffel* conclusively resolves the standing issue in Plaintiff's favor.

The Eighth Circuit further confirms Plaintiff's standing in this case:

> To establish injury in fact for a First Amendment challenge to a state statute, a plaintiff *need not have been actually prosecuted or threatened with prosecution. St. Paul Area Chamber of Commerce v. Gaertner*, 439 F.3d 481, 487 (8th Cir. 2006). Rather, the plaintiff needs only to establish that he would like to engage in arguably protected speech, but that he is chilled from doing so by the existence of the statute. Self-censorship can itself constitute injury in fact. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988).

*281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011) (emphasis added).

Here, Plaintiff <u>has</u> been "threatened with prosecution." She was told by police officers to halt her speech activity or face prosecution. The official police report states that

"[Defendant Meyer] spoke with Ness and advised how the Principal and parent felt and *asked her to stop filming*," concluding that "Ness was advised that she could be charged with harassment if the parents and principal felt intimidated by her actions." (Compl. ¶ 54 [emphasis added]). Plaintiff was visited at her home by law enforcement officials and told she was under investigation for allegedly violating the challenged statute. The detective conducting the investigation forwarded it to the County Prosecutor for prosecution as a felony since the content of Plaintiff's filming involved minors. (Boomer Decl. ¶ 14 [Doc. No. 27]). At a minimum, Plaintiff has established that she "would like to engage in arguably protected speech, but that [she] is chilled from doing so by the existence of the statute." Similarly, in response to Plaintiff's filming activity, the City passed the City Code provision which expressly proscribes Plaintiff's filming of minors in the City's parks, including Smith Park.[6]

In the First Amendment context, it is well established that "[t]he threat of sanctions may deter . . . almost as potently as the actual application of sanctions." *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965). This fundamental principle is echoed throughout the case law. *Minn. Citizens Concerned for Life v. Fed. Election Comm'n.*, 113 F.3d 129, 132 (8th Cir. 1997) ("Sufficient hardship is usually found if the regulation . . . chills protected First Amendment activity."); *N.H. Right to Life Political Action Comm. v. Gardner*, 99

---

[6] As noted, Detective Boomer forwarded her investigation of Plaintiff to the County for felony prosecution because Plaintiff's filming activity included the filming of minors. (Boomer Decl. ¶ 14 [referring the case under subdivision 3(5) of the Harassment Statute] [Doc. No. 27]; *see also* Ness Suppl. Decl. ¶¶ 2-6, Ex. A, at Ex. 1 [setting forth example of videotaping now proscribed by the City Code] [Doc. No. 47-2]).

F.3d 8, 13 (1st Cir. 1996) ("[A]n actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences.").

The chilling effect caused by the threatened enforcement of the Harassment Statute and the passage of the City Code, which expressly proscribes Plaintiff's First Amendment activity, are more than sufficient to confer standing. The fact that the City now claims that it will not prosecute Plaintiff under the Harassment Statute for her "past conduct" does not change Plaintiff's standing to pursue her claims. Moreover, Plaintiff's claim for nominal damages against the City Defendants for the past loss of her constitutional rights prevents this case from becoming moot. *See Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 802 (8th Cir. 2006). In short, standing is not an issue. The Court has jurisdiction to hear and decide this case.

## II. THE CITY DEFENDANTS VIOLATED PLAINTIFFS' CLEARLY ESTABLISHED RIGHTS PROTECTED BY THE FIRST AND FOURTEENTH AMENDMENTS.

### A. Standard of Review under Rule 12(b)(6).

A claim survives a Rule 12(b)(6) motion to dismiss if its "[f]actual allegations [are] enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true (even if doubtful in fact)." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Accordingly, to survive the City Defendants' motion to dismiss for failure to state a claim, the Complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

- 14 -

Moreover, "when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Twombly*, 550 U.S. at 563 n.8.

Plaintiff's claims satisfy this standard.

### B.    Plaintiff's Filming Activity Is Protected by the First Amendment.

It was clearly established prior to August 27, 2019, that the First Amendment protects Plaintiff's right to videotape and photograph in a public forum information for public dissemination related to a public controversy.  In other words, the First Amendment protects Plaintiff's right to "monitor" the DAF/Success Academy public controversy via "technology"—her filming activity at issue.[7]  This legal proposition is overwhelmingly supported by the case law, including case law that is *binding on this Court*.

To begin, the Supreme Court has long ago affirmed that filming is an activity protected by the First Amendment.  *See Kaplan v. Cal.*, 413 U.S. 115, 118-20 (1973) (observing that the First Amendment is not limited to "expression by words alone," but it also applies "to moving pictures, to photographs, and to words in books," stating, "[a]s

---

[7] In its motion to dismiss, the County confirms that Plaintiff's filming activity falls within the proscriptions of the Harassment Statute by asserting that "[t]he word 'monitor' means 'to watch, keep track of, or check usu[ally] for a special purpose" (Cnty. Mem. at 8 [Doc. No. 63]), which is precisely what Plaintiff is doing here.  And she is doing it via "technology"—video recording.  Consequently, Plaintiff clearly intends to engage in a course of conduct proscribed by the statute (as confirmed by the County's arguments and by City law enforcement officials).  The City Defendants have expressly adopted the County's arguments regarding the Harassment Statute.  (*See* City Mem. at 29 [Doc. No. 68]).

with pictures, films, paintings, drawings, and engravings, both oral utterance and the printed word have First Amendment protection").

And to be clear, this is not a case about filming police officers in a limited or nonpublic forum or while they are performing their duties.  (*See* City Mem. at 10 [citing *Johnson v. McCarver*, 942 F.3d 405, 414 (8th Cir. 2019) (Kelly, J., dissenting in part) (acknowledging that the Eighth Circuit has not decided whether there is a First Amendment right to record and photograph police officers, but urging its recognition) and *Kushner v. Buhta,* No. 16-cv-2646 (SRN/SER), 2018 WL 1866033, at *9 (D. Minn. Apr. 18, 2018), *aff'd,* 771 F. App'x 714, 715 (8th Cir. June 13, 2019); *see id.* at *32 [holding that "[b]ecause room 25 [a law school classroom where the confrontation at issue occurred] was a limited public forum and the University's prohibition on video-recording was a reasonable and viewpoint neutral restriction, Kushner did not have the right to record interactions between police and protesters at the Halbertal lecture").  However, the Eighth Circuit has recently affirmed the clearly established right to record police activity, citing to the "robust consensus" of cases already decided by other circuits.  *See Chestnut v. Wallace*, 947 F.3d 1085, 1090 (8th Cir. 2020) ("Other legal authorities fully support our holding that the right here was clearly established.  Every circuit court to have considered the question has held that a person has the right to record police activity in public. . . .  Four circuits had so decided by the time of the events in question here. . . .  This robust consensus of cases of persuasive authority suggests that, if the constitution protects one who records police activity, then surely it protects one who merely observes it—a necessary prerequisite to recording.") (citations omitted).

- 16 -

Nonetheless, here, Plaintiff is in the very same position as every news organization operating within the County that is filming public information *in a public forum* for public dissemination. Consequently, cases involving filming in nonpublic or limited public forums, such as government buildings, are simply not applicable.

If any doubts linger as to whether Plaintiff's filming activity was protected by the First Amendment on August 27, 2019, those doubts were cast aside by the Eighth Circuit in *Telescope Media Group v. Lucero*, 936 F.3d 740 (8th Cir. 2019).[8] In *Telescope Media Group*, wedding video producers sought injunctive relief to prevent the enforcement of the Minnesota Human Rights Act (MHRA) against them on the theory that it was unconstitutional under the Free Speech Clause of the First Amendment. In this case, the Eighth Circuit stated, unequivocally:

> The Free Speech Clause of the First Amendment covers films, *see Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501-02 (1952), so the videos the Larsens intend to make are "affected with a constitutional interest," *Susan B. Anthony List*, 573 U.S. at 159 (citation omitted). The Larsens' desire "to engage in a course of conduct" that includes the production of videos means that their other claims are affected with a constitutional interest too, regardless of the precise legal theory. *Id.* (citation omitted).
>
> * * *
>
> *The Larsens' videos are a form of speech that is entitled to First Amendment protection*. The *Supreme Court long ago recognized* that "expression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments." *Joseph Burstyn*, 343 U.S. at 502; *see also Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65-66 (1981). Indeed, "[i]t cannot be doubted that motion pictures *are a significant medium for the communication of ideas*." *Joseph Burstyn*, 343 U.S. at 501. "They [can] affect public attitudes and behavior in a variety of

---

[8] This case was decided on August 23, 2019, which was prior to when Defendants Meyer and Roepke approached Plaintiff on August 27, 2019, and advised her to stop her filming activity under threat of arrest/prosecution for violating the Harassment Statute. (*See* Compl. ¶¶ 50-54).

> ways, ranging from direct espousal of a political or social doctrine to the
> subtle shaping of thought which characterizes all artistic expression." *Id.*

*Telescope Media Grp.*, 936 F.3d at 749-51 (emphasis added); *see also Smith v. City of Cumming,* 212 F.3d 1332 (11th Cir. 2000) (holding that the First Amendment protects the right to gather information through photographing or videotaping); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (recognizing a "First Amendment right to film matters of public interest"); *Robinson v. Fetterman*, 378 F. Supp. 2d 534, 541 (E.D. Pa. 2005) (holding that the First Amendment protected the plaintiff as he videotaped and noting that "[v]ideotaping is a legitimate means of gathering information for public dissemination and can often provide cogent evidence").

As stated by the Third Circuit, "The First Amendment protects actual photos, videos, and recordings and for this protection to have meaning the Amendment must also protect the act of creating that material." *Fields v. City of Phila.*, 862 F.3d 353, 358 (3d Cir. 2017) (internal citations omitted); *see also ACLU v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) ("The act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording.  The right to publish or broadcast an audio or audiovisual recording would be insecure, or largely ineffective, if the antecedent act of *making* the recording is wholly unprotected . . . ."); *Silberberg v. Bd. of Elections of N.Y.*, 272 F. Supp. 3d 454, 479 (S.D.N.Y. 2017) ("The act of taking a photograph, though not necessarily a communicative action in and of itself, is a necessary prerequisite to the existence of a photograph.  It follows that the taking of photographs is also protected by

the First Amendment."); *Martin v. Evans*, 241 F. Supp. 3d 276, 286 (D. Mass. 2017)

("Among the protected forms of information gathering is audio and audiovisual

recording."). The Eighth Circuit plainly agrees with this position. *Telescope Media Grp.*,

936 F.3d at 749-51.

Moreover, the argument that Defendants are merely regulating Plaintiff's *conduct*

and not her *speech* was rejected by the Eighth Circuit:

> Minnesota's position is that it is regulating the Larsens' conduct [*i.e.* their
> videotaping], not their speech. To be sure, producing a video requires several
> actions that, individually, might be mere conduct: positioning a camera,
> setting up microphones, and clicking and dragging files on a computer
> screen. But what matters for our analysis is that these activities come
> together to produce finished videos that are "medi[a] for the communication
> of ideas." . . . . "*Whether government regulation applies to creating,
> distributing, or consuming speech makes no difference*."

*Telescope Media Grp.*, 936 F.3d at 752 (citations omitted) (emphasis added).[9]  As the

Eighth Circuit noted, accepting Defendants' erroneous argument that they are merely

regulating Plaintiff's conduct and not her speech would undermine the protections afforded

by the First Amendment:

> If we were to accept Minnesota's invitation to evaluate each of the Larsens'
> acts individually, then wide swaths of protected speech would be subject to

---

[9] Accordingly, the City's following assertions are demonstrably false: "The Court will
search in vain for a case holding that the First Amendment *allows for* open season on the
filming or photographing of children if those children are in a public place" (City Mem. at
10 [Doc. No. 68] [emphasis added]); "[A]s of the date that Sergeant Roepke and Officer
Meyer interacted with Ness, the Eighth Circuit had not recognized *any* First Amendment
protection *for recording activity* . . . ." (*id.* [emphasis added]); "The Supreme Court has yet
to recognize a First Amendment right to record." (*id.* at 12); "Recording is different than
standing on a soapbox in the park to give a speech. Recording is an act of gathering
information." (*id.* at 20); and "[E]ven if recording receives First Amendment protection,
recording is not entitled to the same degree of protection that speech itself receives." (*id.*
at 22).

regulation by the government.  The government could argue, for example, that painting is not speech because it involves the physical movements of a brush.  Or it could claim that publishing a newspaper is conduct because it depends on the mechanical operation of a printing press.  It could even declare that a parade is conduct because it involves walking. . . .  *Speech is not conduct just because the government says it is*.

*Id.* at 752 (emphasis added).

In this case, Plaintiff engages in her filming activity for the purpose of disseminating public information regarding a public controversy.  Moreover, Plaintiff principally disseminates this information via the Internet.  This fact further supports, and enhances, the First Amendment protection afforded to her filming activity.  As stated by the Supreme Court:

While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear.  It is cyberspace—the "vast democratic forums of the Internet" in general, and social media in particular. . . .  In short, social media users employ these websites to engage in a wide array of protected First Amendment activity on topics "as diverse as human thought."

*Packingham v. N.C.*, 137 S. Ct. 1730, 1735-36 (2017) (citations omitted).

In the final analysis, it would be clear error to conclude that Plaintiff's filming activity does not enjoy First Amendment protection.  In short, Plaintiff's free speech activity is beyond the reach of the City Code and the Harassment Statute.

**C.     The City Code Is an Unlawful, Content-Based Prior Restraint on Speech in a Public Forum.**

For official acts that infringe First Amendment liberties, the Supreme Court has "long recognized that even regulations aimed at proper governmental concerns can restrict unduly the exercise of rights protected by the First Amendment."  *Minneapolis Star &*

*Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 592 (1983).  And "[e]ven where the protection of children is the object, the constitutional limits on governmental action apply."  *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 804-05 (2011).

On its face, the challenged ordinance is a content-based restriction on First Amendment activity in a traditional public forum.  Moreover, the ordinance operates as a prior restraint in that it requires Plaintiff to receive permission *before* she can engage in her First Amendment activity.  *See Alexander v. United States*, 509 U.S. 544, 550 (1993) ("The term 'prior restraint' is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur.") (internal quotations and citation omitted).  As stated by the Supreme Court, "[a]*ny system* of prior restraints of expression comes to this Court bearing a *heavy presumption against its constitutional validity*."  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963) (collecting cases) (emphasis added).  The City has not, nor could it, overcome this "heavy presumption."

The City Code provision at issue states: "No person shall intentionally take a photograph or otherwise record a child without the consent of the child's parent or guardian."  § 5.21(24).  A violation of this provision is a "petty misdemeanor."  § 5.22. This provision only applies in City parks,[10] which are traditional public forums for

---

[10] The City's "captive-audience" argument is without merit for numerous reasons.  The most obvious, however, is that the challenged ordinance does *not* limit its filming restriction to just public parks that also happen to be used by public schools for recess.  The ordinance is very broad in its scope, applying to *all* City parks.  Moreover, there is no "captive audience" in *any* public park.  This is not a situation that is remotely similar to the targeted picketing of a residence, *compare Frisby v. Schultz*, 487 U.S. 474, 484-87 (1988)

purposes of examining the constitutionality of this code provision under the First Amendment. *See Hague v. CIO*, 307 U.S. 496, 515 (1939).

Content-based restrictions on speech in a public forum are subject to strict scrutiny. *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 800 (1985). That is, "speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Id.* For "[i]t is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995).

To determine whether a restriction is content based, the courts look at whether it "restrict(s) expression because of its message, its ideas, its subject matter, or its content." *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm. of N.Y.*, 447 U.S. 530, 537 (1980). That is, "[a] rule is defined as a content-based restriction on speech when the regulating party must examine the speech to determine if it is acceptable." *Glendale Assocs. v. NLRB*, 347 F.3d 1145, 1155 (9th Cir. 2003); *see also Telescope Media Grp.*, 936 F.3d at 753 ("The

_____

(explaining the uniqueness of a private residence and why the law should treat it differently as a matter of fact), nor is it remotely analogous to a situation involving "mourners attending a funeral," *Phelps-Roper v. City of Manchester*, 697 F.3d 678, 692 (8th Cir. 2012); *see also Snyder v. Phelps*, 562 U.S. 443, 459 (2011) (holding that the funeral protestors' First Amendment rights were violated by the award of civil damages and stating that "we have applied the captive audience doctrine only sparingly"). Furthermore, the First Amendment activity at issue here is the silent and peaceful filming of activity within a public park. *See Telescope Media Grp.*, 936 F.3d at 754 ("In an as-applied challenge like this one, the focus of the strict-scrutiny test *is on the actual speech being regulated* . . . .) (emphasis added). This case does not involve disruptive or confrontational picketing or protest activity.

MHRA also operates in this case as a content-based regulation of the Larsens' speech, even if, as the Supreme Court has recognized, the MHRA does not, "[o]n its face, . . . aim at the suppression of speech." . . .  A content-based regulation . . . "exacts a penalty on the basis of the content of" speech.") (internal citations omitted).

On its face, the City's prohibition on filming children in a public park is content based, requiring the City to meet the strict scrutiny standard.  The ordinance does not make speaker-based distinctions.  Rather, it makes distinctions on the basis of the content of the filming.  In order to prosecute a person for violating the City Code provision, a City official would have to examine the content of the film to determine whether the filming was unlawful.  If no child appeared on the film, then there would be no violation.  If Plaintiff was filming squirrels, birds, or trees, as evidenced by the content of her film, she could not be prosecuted for violating the ordinance.  Thus, this is a content-based regulation requiring *the City* to demonstrate a compelling state interest and to demonstrate that the restriction on First Amendment activity is narrowly drawn to achieve that interest.  The City has failed to do so.[11]  And because the ordinance is woefully underinclusive, it is not possible for the City to meet this most exacting scrutiny (or even intermediate scrutiny) under the law.

The City has admitted that the ordinance does not "restrict the ability of people to record children without consent if they film from a public street or on private property."

---

[11] The City's claimed "interest" in protecting children from "intimidation" and from photographers sticking "their cameras in minors' faces" (City Mem. at 23, 25 [Doc. No. 68]) is also undermined by the fact that the ordinance also prohibits *clandestine* filming of children in the City's parks.  The ordinance makes no distinctions based on the *method* of the filming.  It only makes distinctions based on the *content* of the filming.

(City Mem. at 25 [Doc. No. 68]).  The City's admission constitutes the very definition of a law which is underinclusive, thereby _undermining_ its claimed interests.  *See, e.g., Brown*, 564 U.S. at 805 ("As a means of protecting children from portrayals of violence, the legislation is seriously underinclusive, not only because it excludes portrayals other than video games, but also because it permits a parental or avuncular veto.").  As noted by the Supreme Court, "Exemptions from an otherwise legitimate regulation of a medium of speech may be noteworthy for a reason quite apart from the risks of viewpoint and content discrimination:  They may diminish the credibility of the government's rationale for restricting speech in the first place."  *City of Ladue v. Gilleo,* 512 U.S. 43, 52 (1994). Moreover, per the Supreme Court, "It is established in our strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited."  *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 547 (1993) (internal quotations and citation omitted).

Per the City's argument, Plaintiff would be committing a "petty misdemeanor" if she filmed children using Smith Park while she was standing in the park.  But if Plaintiff took a step or two back onto the public sidewalk (or onto the public street), the very same filming activity is permissible.  Contrary to the City's argument, this fact does not counsel in favor of upholding the ordinance—it is fatal to its constitutionality.  As a means of pursuing its alleged objectives, the City Code "is so woefully underinclusive as to render belief in [its stated] purpose a challenge to the credulous."  *Republican Party v. White*, 536 U.S. 765, 780 (2002).

In the final analysis, "[t]he ordinance before us makes a crime out of what under the Constitution cannot be a crime. It is aimed directly at activity protected by the Constitution." *Coates v. Cincinnati*, 402 U.S. 611, 616 (1971).

### D.    The Harassment Statute Cannot Be Used to Punish Plaintiff's First Amendment Activity.

The Harassment Statute makes a crime out of Plaintiff's filming activity, in violation of the U.S. Constitution. *Coates*, 402 U.S. at 616. Moreover, as noted above, the argument that Plaintiff's filming is *conduct* and not *speech* and thus proscribable under the Harassment Statute was rejected by the Eighth Circuit. *See Telescope Media Grp.*, 936 F.3d at 752 ("Speech is not conduct just because the government says it is.").

In sum, the Harassment Statute is unlawful, facially and as applied to Plaintiff's filming activity, because (1) it makes a crime out of what under the Constitution cannot be a crime; (2) it is unconstitutionally vague because it permits arbitrary, discriminatory, and subjective enforcement; (3) it is content based by proscribing Plaintiff's free speech activity based on the reaction of others to it; and (4) it is unconstitutionally overbroad.

### 1.    The Harassment Statute Is Unconstitutionally Vague.

As the Supreme Court stated in *Grayned v. City of Rockford*, 408 U.S. 104 (1972):

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide *explicit standards* for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the

> attendant dangers of arbitrary and discriminatory application.  Third, but related, *where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms*. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.

*Id*. at 108-09 (internal punctuation and quotations omitted) (emphasis added); *see Cox v. La.*, 379 U.S. 536, 551-52 (1965) (holding that the challenged breach of the peace statute was unconstitutionally vague in its overly broad scope, for Louisiana defined "breach of the peace" as "to agitate, to arouse from a state of repose, to molest, to interrupt, to hinder, to disquiet"; yet one of the very functions of free speech "is to invite dispute") (quoting *Terminiello v. City of Chi.*, 337 U.S. 1, 4-5 (1949)).  As stated by the Court in *Coates*:

> In our opinion this ordinance is unconstitutionally vague because it subjects the exercise of the right of assembly to an unascertainable standard, and unconstitutionally broad because it authorizes the punishment of constitutionally protected conduct. . . .  It is said that the ordinance is broad enough to encompass many types of conduct clearly within the city's constitutional power to prohibit.  And so, indeed, it is.  The city is free to prevent people from blocking sidewalks, obstructing traffic, littering streets, committing assaults, or engaging in countless other forms of antisocial conduct.  It can do so through the enactment and enforcement of ordinances directed with reasonable specificity toward the conduct to be prohibited. . . . *It cannot constitutionally do so through the enactment and enforcement of an ordinance whose violation may entirely depend upon whether or not a policeman is annoyed*.

*Coates*, 402 U.S. at 614 (emphasis added); *see also Dombrowski v. Pfister*, 380 U.S. 479, 479 (1965) (striking down under the "vagueness doctrine" the provision of a state law defining subversive organizations because the language was unduly vague, uncertain, and broad and thereby inhibited protected expression).

Consequently, in the First Amendment context, "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms."  *NAACP v.*

*Button*, 371 U.S. 415, 438 (1963).  The Harassment Statute fails to provide the necessary precision to withstand this constitutional challenge.

More specifically, the Harassment Statute can be enforced, as this case demonstrates, based solely on whether a person is annoyed by or objects to Plaintiff exercising her First Amendment rights.  (*See* Compl. ¶ 54).  Per the statute, "'harass' means to engage in conduct which the actor knows or has reason to know would *cause the victim under the circumstances to feel frightened, threatened, oppressed, persecuted, or intimidated, and causes this reaction on the part of the victim.*"  Minn. Stat. § 609.749(1) (emphasis added).  Moreover, "[i]n a prosecution under this section, *the state is not required to prove that the actor intended to cause the victim to feel frightened, threatened, oppressed, persecuted, or intimidated . . . .*"  Minn. Stat. § 609.749(1a) (emphasis added).  As the police officers who initially warned Plaintiff about her filming activity stated in their official police report: "Ness was advised that she could be charged with harassment *if the parents and principal felt intimidated by her actions.*"  (Compl. at ¶ 54 [emphasis added]).  Consequently, the Harassment Statute permits Defendants to prosecute Plaintiff based "on an ad hoc and subjective basis"—that is, whether a "victim" subjectively feels "*frightened, threatened, oppressed, persecuted, or intimidated*" by Plaintiff's filming activity, and this is true regardless of whether Plaintiff intends to make the victim feel this way.  Thus, a "violation may entirely depend upon whether or not a [a person] is annoyed," *Coates*, 402 U.S. at 614, in violation of the First and Fourteenth Amendments.

The U.S. Supreme Court has long held that

> a function of free speech under our system of government is to invite dispute.
> It may indeed best serve its high purpose when it induces a condition of
> unrest, creates dissatisfaction with conditions as they are, or even stirs people
> to anger.   Speech is often provocative and challenging.   It may strike at
> prejudices and preconceptions and have profound unsettling effects as it
> presses for acceptance of an idea.   That is why freedom of speech . . . is . . .
> protected against censorship or punishment. . . .   There is no room under our
> Constitution for a more restrictive view.

*Terminiello v. City of Chi.*, 337 U.S. 1, 4 (1949) (emphasis added).   Accordingly, the

government is without authority to prosecute a person for engaging in First Amendment

speech activity that might cause another to feel "*frightened, threatened, oppressed,*

*persecuted, or intimidated*" absent a showing that the speech itself constitutes a "true

threat," *see Va. v. Black*, 538 U.S. 343, 359 (2003) (describing a "true threat" as a "serious

expression of an intent to commit an act of unlawful *violence*"), which is a narrow

exception under the First Amendment that is impossible to show here since the activity at

issue (filming in public) is peaceful.

   In the final analysis, the Harassment Statute is unlawfully vague.   First, it permits

"arbitrary and discriminatory enforcement" by failing "to provide *explicit standards* for

those who apply them."   Second, it "impermissibly delegates basic policy matters to

policemen, judges, and juries for resolution on an ad hoc and subjective basis"—that is, it

permits prosecution based on the subjective feelings of the alleged "victim."   And third,

this statute "abuts upon sensitive areas of basic First Amendment freedoms" and thus

"operates to inhibit the exercise of those freedoms," all in violation of the First and

Fourteenth Amendments.

### 2.     The Harassment Statute Permits an Unlawful Heckler's Veto.

As the evidence demonstrates without contradiction, government officials have responded to and relied upon the reaction of those who oppose Plaintiff's speech activity as the basis for enforcing the Harassment Statute against her.  (Compl. ¶¶ 52-56).  As noted above, the language of the statute expressly permits this heckler's veto.  That is, it permits the prosecution of Plaintiff based entirely on the reaction of the "victims" to her filming activity.  This is prohibited under the First Amendment.[12]  *See Lewis v. Wilson,* 253 F.3d 1077, 1082 (8th Cir. 2001) ("The First Amendment knows no heckler's veto."); *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780, 789 (9th Cir. 2008) ("Whether prospectively, as in *Forsyth County*, or retrospectively, as in the case before us, the government may not give weight to the audience's negative reaction.").  And because the "hecklers" are claiming to object on behalf of children is of no moment for First Amendment purposes.  *Id*. at 790 ("It would . . . be an unprecedented departure from bedrock First Amendment principles to allow the government to restrict speech based on listener reaction simply because the listeners are children").

A heckler's veto is impermissible because it is *not* a content-neutral basis for regulating speech activity.  As stated by the Supreme Court, "Listeners' reaction to speech is not a content-neutral basis for regulation."  *Forsyth Cnty. v. Nationalist Movement*, 505

---

[12] The City Defendants confirm that the statute operates as a heckler's veto, asserting that the officers informed Plaintiff "that the reaction of the subjects of her recording activity is relevant to whether her conduct might constitute 'harassment' under the statute."  (City Mem. at 8 [Doc. No. 68]).  This assertion also provides additional support for Plaintiff's claim that the statute is unconstitutionally vague.  *See supra.*

U.S. 123, 134 (1992).   In other words, a heckler's veto operates as a content-based restriction.  *See, e.g., Bible Believers v. Wayne Cnty.,* 805 F.3d 228, 248 (6th Cir. 2015) ("The heckler's veto is [a] type of odious viewpoint discrimination.").  Consequently, the Harassment Statute must withstand strict scrutiny, *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) ("Content-based laws . . . are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.") (citation omitted), which it cannot.  Moreover, "[i]n an as-applied challenge like this one, the focus of the strict-scrutiny test is on the *actual speech being regulated*, rather than how the law might affect others who are not before the court." *Telescope Media Grp.*, 936 F.3d at 754 (emphasis added).  Here, there is no *compelling* state interest served by restricting Plaintiff's peaceful filming activity.  None.  The statute is unconstitutional.

### 3.    The Harassment Statute Is Unconstitutionally Overbroad.

As stated by the Eighth Circuit:

> When interpreting Minnesota's statutes, we are bound by the decisions of the Minnesota Supreme Court.  *Hope v. Klabal*, 457 F.3d 784, 790 (8th Cir. 2006).  If the Minnesota Supreme Court has not decided an issue, we must predict how that court would decide the issue.  *In re Gen. Am. Life Ins. Co. Sales Practices Litig.*, 391 F.3d 907, 911 (8th Cir. 2004).  In making such a prediction, we may consider relevant state precedent and analogous decisions.  *Id.*  Decisions from the Minnesota Court of Appeals are "particularly relevant" and *we must follow such decisions* when they are the best evidence of Minnesota law. *Id*. at 912.

*Baribeau v. City of Minneapolis*, 596 F.3d 465, 475 (8th Cir. 2010) (emphasis added).

Accordingly, decisions by the Minnesota courts invalidating various state criminal statutes on First Amendment grounds because they are overbroad compel the conclusion that the

challenged Harassment Statute should receive a similar fate. *See In re Welfare of A.J.B.*, 929 N.W.2d 840 (Minn. 2019) (hereinafter "*A.J.B.*") (striking down on First Amendment grounds the stalking-by-mail provision, Minn. Stat. § 609.749, subd. 2(6)); *State v. Peterson*, 936 N.W.2d 912 (Minn. Ct. App. 2019) (striking down on First Amendment grounds the stalking-by-telephone provision, Minn. Stat. § 609.749, subd. 2(4)); *see also State v. Casillas*, No. A19-0576, 2019 Minn. App. LEXIS 400 (Minn. Ct. App. Dec. 23, 2019) (striking down on First Amendment grounds Minn. Stat. § 617.261, which makes it a crime to intentionally disseminate an image of another person who is depicted in a sexual act or whose intimate parts are exposed).

This past December, the Minnesota Court of Appeals struck down a criminal statute on First Amendment overbreadth grounds "as a result of its lack of an intent-to-harm requirement and its use of a negligence *mens rea*." *Id*. at *1. That is precisely the situation presented here with the challenged Harassment Statute: there is no intent-to-harm requirement, and it uses a negligence *mens rea*.

As discussed further below, the Harassment Statute is overbroad because "it prohibits constitutionally protected activity, in addition to activity that may be prohibited without offending constitutional rights," and the amount of protected speech or expressive conduct that is prohibited is substantial. *State v. Macholz*, 574 N.W.2d 415, 419 (Minn. 1998).

To determine whether the challenged Harassment Statute is overbroad in violation of the First Amendment, the Court conducts a four-part inquiry. *See A.J.B.*, 929 N.W.2d at 847-48. First, the Court interprets the statute. *Id*. at 847. Second, the Court determines

whether the statute's "reach is limited to unprotected categories of speech or expressive conduct." *Id.* Third, if the Court concludes that the statute is not limited to unprotected speech or expressive conduct, then it asks whether a "substantial amount" of protected speech is criminalized. *Id.* And fourth, the Court evaluates whether it is able to narrow the statute's construction or sever specific language to cure its constitutional defects. *Id.* at 848.

"Ordinarily, [Minnesota] laws are afforded a presumption of constitutionality, but statutes allegedly restricting First Amendment rights are not so presumed." *Dunham v. Roer*, 708 N.W.2d 552, 562 (Minn. Ct. App. 2006).

We turn now to the language of the challenged statute—the first step of the overbreadth inquiry. Section 609.749, subdivision 2(2) criminalizes, *inter alia*, "monitor[ing] . . . another . . . through any available technological or other means." Minn. Stat. § 609.749, subd. 2(2).[13] Unlike the stalking-by-mail and stalking-by-telephone provisions found unlawful by the Minnesota courts, this "monitoring-by-technology" provision does not have a "repeatedly" requirement. Similar to the stalking-by-mail and stalking-by-telephone provisions, the monitoring-by-technology provision does not require proof of an intent to harm (§609.749, subd. 1a), and it uses a broad negligence *mens rea* (§ 609.749, subd. 1). *See Peterson*, 936 N.W.2d at 918-19 (discussing similarities between the stalking-by-mail and stalking-by-telephone provisions).

---

[13] Subdivision 3(5) makes such "monitoring" of a minor a felony offense. Minn. Stat. §609.749, subd. 3(5); (*see* Boomer Decl. ¶ 14 [referring the case to the County Prosecutor for prosecution under subdivision 3(5)] [Doc. No. 27]).

As this case demonstrates, the monitoring-by-technology provision has broad language that restricts protected First Amendment activity: it prohibits filming (*i.e.*, using technology, such as a smart phone or video camera, to "monitor") someone in public (it prohibits filming someone in private as well). (*See* n.7, *supra*). It does not criminalize only filming linked to criminal conduct. And it is error to argue that the Harassment Statute merely restricts conduct. (*See supra* § II.B.); *Telescope Media Grp.*, 936 F.3d at 752. Similar to the conclusion reached in step two of the inquiry by the Minnesota Appellate Court in *Peterson*:

> Because the [monitoring-by-technology] provision is not limited to prohibiting conduct directly linked to criminal activity, reaches negligent [speech activity such as photographing and videotaping], and allows the state to prove its case by a victim's subjective reaction to the defendant's conduct, [this Court should] conclude that the provision prohibits speech protected by the First Amendment.

*Peterson*, 936 N.W.2d at 920.

Because the challenged provision does restrict protected speech, we turn now to the third step of the inquiry, whereby the Court must consider "whether the statute prohibits a substantial amount of constitutionally protected speech." *Id.* at 921 (internal quotations and citation omitted). As this case illustrates, on multiple occasions law enforcement personnel have warned Plaintiff that her *entirely peaceful* filming activity subjects her to prosecution under the Harassment Statute. (Compl. ¶¶ 50-57; *see also* Boomer Decl. ¶ 14 [Doc. No. 27]). As specifically stated in the City's police report, Defendant Meyer "spoke with the (sic) Principal Rabeaa and parent Farrah and they stated the following: They both felt intimidated and scared that Ness was filming them and are worried that she may

become violent towards them or their school.  I spoke with Ness and advised how the Principal and parent felt and asked her to stop filming."  (Comp. ¶ 53).  The police report concludes, "Ness was advised that she could be charged with harassment if the parents and principal felt intimidated by her actions."  (*Id*. at ¶ 54).  As another example, under the challenged statute, a news reporter who was "monitoring" a politician by photographing and videotaping him or his campaign staff to expose the politician's misdeeds, thereby causing the politician or his staff to feel "frightened, threatened, oppressed, persecuted, or intimidated," may be charged with a crime.  The scenarios one could contemplate whereby this statute would restrict protected activity are too numerous to recount here.  *See A.J.B.*, 929 N.W.2d at 853 (discussing hypothetical scenarios demonstrating the statute's substantial overbreadth); *Peterson*, 936 N.W.2d at 921 (same).  Consequently, "[d]ue to the substantial ways" in which the monitoring-by-technology provision "can prohibit and chill protected expression, [this Court should] conclude that the statute facially violates the First Amendment overbreadth doctrine."  *See A.J.B.*, 929 N.W.2d at 856.

Finally, for the reasons that the Minnesota courts could not save the stalking-by-mail and stalking-by-telephone provisions, there is no way for this Court to narrow the construction or to sever language to save the monitoring-by-technology provision.  *See id.* at 857; *Peterson*, 936 N.W.2d at 921-22.  As stated by the U.S. Supreme Court:

> We will not rewrite a . . . law to conform it to constitutional requirements, for doing so would constitute a serious invasion of the legislative domain, and sharply diminish [the Legislature's] incentive to draft a narrowly tailored law in the first place.

- 34 -

*United States v. Stevens*, 559 U.S. 460, 481 (2010) (quotations and citations omitted).[14]

In short, there is no way for this Court to separate criminal conduct from conduct protected by the First Amendment.  "Doing so would not alter the negligence *mens rea* standard, thus a narrowing construction would not alleviate the statute's chilling effect." *Peterson*, 936 N.W.2d at 922; *see also Casillas*, 2019 Minn. App. LEXIS 400, at *32-35 (stating that the "constitutional defect" in the challenged statute "stems from its lack of an intent-to-harm requirement and its use of a negligence *mens rea*" and setting forth reasons for why the court is not able to save it).

The Harassment Statute is unconstitutionally overbroad.

## III.   THE OFFICERS DO NOT ENJOY QUALIFIED IMMUNITY.

To begin, qualified immunity does not protect a defendant against claims for declaratory and injunctive relief, it does not apply to claims against a municipality, nor does it apply to claims against a defendant in his official capacity.  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841, n.5 (1998) (noting that qualified immunity is unavailable "in a suit to enjoin future conduct [or] in an action against a municipality"); *Cannon v. City & Cnty. of Denver*, 998 F.2d 867, 876 (10th Cir. 1993) ("[T]here is no qualified immunity to shield the defendants from claims [for declaratory and injunctive relief]"); *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 527 (9th Cir. 1989) (same); *Hall v. Tollett*,

---

[14] "In fact, the Supreme Court has disapproved of the practice by state courts of *rewriting,* rather than adopting a *reasonable* limiting construction, of, statutes and ordinances."  *State v. Crawley*, 819 N.W.2d 94, 117 n.3 (Minn. 2012) (Stras, J., dissenting).

128 F.3d 418, 430 (6th Cir. 1997) ("Qualified immunity . . . does not shield [the defendant] from the claims brought against him in his official capacity.").

Further, the defense of qualified immunity does not shield Defendants Meyer and Roepke from liability for violating Plaintiff's clearly established rights.  In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Court stated the applicable standard as follows: government officials are protected from personal liability and thus enjoy qualified immunity only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818.  And "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citation omitted).  "The test focuses on the objective legal reasonableness of an official's acts, and the qualified immunity defense fails if the official violates a clearly established right because 'a reasonably competent public official should know the law governing his conduct.'" *Jones v. Coonce*, 7 F.3d 1359, 1362 (8th Cir. 1993) (quoting *Harlow*, 457 U.S. at 818-19).  As the Supreme Court noted in *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), "officials can still be on notice that their conduct violates established law even in novel factual circumstances."

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Court mandated a two-step sequence for resolving government official's qualified immunity claims.  First, a court must decide whether the facts alleged or shown by a plaintiff make out a violation of a constitutional right.  And second, if the plaintiff has satisfied this first step, the court must decide whether

the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id.* at 201; *Baribeau v. City of Minneapolis*, 596 F.3d 465, 474 (8th Cir. 2010); *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1155 (8th Cir. 2014); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (stating that courts have discretion to "decid[e] which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand").

Consequently, whether a right is "clearly established" is ultimately an *objective*, legal analysis. As stated by the Supreme Court, "By defining the limits of qualified immunity essentially in objective terms, *we provide no license to lawless conduct*." *Harlow*, 457 U.S. at 819 (emphasis added).

As set forth above, the Court should have little difficulty rejecting the officers' qualified immunity defense. Plaintiff's First Amendment right to engage in her filming activity without government interference was clearly established on August 27, 2019, when the officers exercised their authority under color of law to chill and thus deny Plaintiff of this right. *See, e.g., Telescope Media Grp.*, 936 F.3d at 749-51 (confirming the clearly established right to film under the First Amendment).

In the final analysis, the officers' threats were real; they were credible; and they had the predictable effect of halting Plaintiff's filming activity, thus depriving Plaintiff of her clearly established right to film under the First Amendment. The officers do not enjoy qualified immunity. *See, e.g., Chestnut*, 947 F.3d at 1090 (denying qualified immunity and noting the "robust consensus of cases of persuasive authority," including cases decided

prior to the incident at issue, "suggest[ing that] the constitution protects one who records police activity").

**CONCLUSION**

Plaintiff respectfully requests that the Court deny the City Defendants' motion.

Respectfully submitted,

**MOHRMAN, KAARDAL & ERICKSON, P.A.**

/s/ *William F. Mohrman*
William F. Mohrman, 168816
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
Tel: (612) 465-0928
Fax: (612) 341-1076
mohrman@mklaw.com

**AMERICAN FREEDOM LAW CENTER**

/s/ *Robert J. Muise*
Robert J. Muise, Esq.* (MI P62849)
PO Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756
Fax: (801) 760-3901
rmuise@americanfreedomlawcenter.org
*Admitted *pro hac vice*

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 16, 2020, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the court's electronic filing system.  Parties may access this filing through the court's system.  I further certify that a copy of the foregoing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically: None.

**AMERICAN FREEDOM LAW CENTER**

/s/*Robert J. Muise*
Robert J. Muise, Esq.

*Counsel for Plaintiff*